**2025 UT App 94**

## THE UTAH COURT OF APPEALS

JACQUELINE KEMPTON TAYLOR,
Appellant,
*v.*
MARK BENNETT TAYLOR,
Appellee.

Opinion
No. 20230868-CA
Filed June 26, 2025

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 204500009

Beth E. Kennedy, Taylor P. Webb, and Caroline A.
Olsen, Attorneys for Appellant

F. Kevin Bond and Kevin B. Call,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and
MICHELE M. CHRISTIANSEN FORSTER concurred.

LUTHY, Judge:

¶1     Jacqueline Kempton Taylor appeals the district court's
determination that under Texas law the alimony provisions of a
postnuptial agreement she entered with Mark Bennett Taylor are
unenforceable because they lack essential terms. We conclude that
this determination of the district court was in error. We therefore
reverse the court's decision precluding alimony, and we remand
the matter for further proceedings consistent with this opinion.

BACKGROUND

*The Parties' Marriage and Prenuptial Agreement*

¶2    Jacqueline (Jackie) and Mark[1] were married in 2012. Prior to their marriage and while living in Virginia, they signed a prenuptial agreement. That agreement included a waiver-of-alimony provision that stated, in part, "In the event of a divorce, the parties hereby waive the right to make any claim for the purposes of alimony, maintenance and support, whether permanent, periodic, temporary, rehabilitative, bridge-the-gap, lump sum or otherwise."

*The Postnuptial Agreement and Amendments*

¶3    In 2019, while residing in Texas, Jackie and Mark executed a postnuptial agreement. Article I, Section B of the postnuptial agreement reads as follows:

> On page 12 of the [prenuptial agreement], the Parties agreed to waive alimony claims. The parties amend that provision and eliminate the waiver of alimony. The parties agree to amend the [prenuptial agreement] as follows: 7.07(b)
>
> In the event of a divorce, Mark Bennett Taylor shall pay Jacqueline Kempton Taylor alimony as follows:
>
> a.    Mark Bennett Taylor shall pay Jacqueline Kempton Taylor no less than 20% of his income as spousal support/alimony upon the divorce of the

---

1. "As is our practice, because the parties share the same last name, we use their first names, with no disrespect intended by the apparent informality." *Nelson v. Nelson*, 2023 UT App 38, ¶ 1 n.1, 529 P.3d 370, *cert. denied*, 537 P.3d 1011 (Utah 2023).

parties until the death or remarriage of Jacqueline Kempton Taylor. In the event that the jurisdiction where the divorce is filed does not provide for spousal support or alimony, this payment shall be characterized as a division of marital property.

b.      In the event that there is infidelity (defined as any intimate contact with a person not Jacqueline Kempton Taylor) by Mark Bennett Taylor, Mark Bennett Taylor shall pay Jacqueline Kempton Taylor no less than 30% of his income as spousal support/alimony until the death or remarriage of Jacqueline Kempton Taylor. In the event that the jurisdiction where the divorce is filed does not provide for spousal support or alimony, this payment shall be characterized as a division of marital property.

¶4     The postnuptial agreement also contains a choice-of-law provision, which reads, "This agreement is performable in Harris County, Texas, and shall be governed by, construed and enforced in accordance with the laws of the State of Texas."

*The Divorce Petition and District Court Proceedings*

¶5     Jackie and Mark moved to Utah in 2020. Not long after that move, Jackie petitioned for divorce. In her petition, Jackie asked that under the terms of the postnuptial agreement, Mark "be ordered to pay monthly alimony in the amount of $11,077 until [Jackie] remarries."

¶6     Jackie subsequently filed a motion for partial summary judgment, asking the district court to hold, among other things, that the postnuptial agreement "is binding and enforceable between the parties." The court denied the motion, determining that it could not "rule on the enforceability of the [postnuptial agreement] based on the record before it as a matter of law" for

several reasons, including "that the agreement with respect to use of the word 'income' is ambiguous as a matter of law because it is susceptible to more than one reasonable interpretation." To the court, "income" could be reasonably understood to mean either gross income or net income. The court further determined that to resolve this ambiguity, it would need to consider "extrinsic evidence of the parties' intent or understanding at the time of entering into the contract."

¶7 The district court ordered a bifurcated trial. It scheduled a first trial to resolve issues related to the postnuptial agreement, alimony, and the parties' incomes. And it reserved the remaining issues, including those of child support and child custody, for a later trial. Following Jackie's direct testimony at the first trial, Mark moved for judgment as a matter of law under rule 56 of the Utah Rules of Civil Procedure, asserting that the postnuptial agreement "is not enforceable because it lacks essential terms."

¶8 The district court agreed with Mark. It determined that the agreement was silent on a number of terms that the court regarded as essential, including the following:

> a schedule or due date for the alimony payments (i.e., whether it is to be paid weekly, monthly, quarterly, or annually); a procedure for how "income" is to be determined, including the sources of proof of "income"; a procedure and schedule for how and when the determination of "income" is to be updated (i.e., whether it is monthly, quarterly, annually, or when "income" changes by a certain percentage); and when an updated calculation of alimony becomes effective (i.e., whether it is the week, month, quarter, or year after "income" changes).

The court explained that because these terms were missing, it would not be possible for either party "to determine whether and

when a breach ha[d] occurred." Having determined that the postnuptial agreement was "silent on essential terms," the court determined that the agreement was unenforceable "with respect to Article I, Sections B(a) and B(b)." It reserved for later consideration "the issue of whether the remaining provisions" of the agreement were enforceable.

¶9 A week after the court ruled orally that Article I, Sections B(a) and B(b) of the postnuptial agreement were unenforceable, Jackie again moved for partial summary judgment, this time requesting a holding that Article I, Section B's elimination of the prenuptial agreement's alimony waiver "is valid and enforceable," despite the court's ruling that the minimum alimony provisions in Article I, Sections B(a) and B(b) "fail for indefiniteness." The court denied Jackie's motion, ruling that the postnuptial agreement's clause eliminating the parties' prenuptial waiver of alimony was "unenforceable as a matter of law because, under Texas law regarding severability, that clause [was] mutually dependent on" the minimum alimony provisions of the postnuptial agreement, which the court had already ruled were unenforceable.

¶10 Eventually, the parties entered a settlement agreement resolving the remaining issues in the divorce while preserving Jackie's right to appeal the ruling regarding the enforceability of the alimony provisions in the postnuptial agreement. The court then issued a divorce decree based on the settlement agreement. Jackie now appeals.

ISSUE AND STANDARD OF REVIEW

¶11 Jackie asserts that the district court erred by concluding that the postnuptial agreement is missing essential terms and, therefore, that Article I, Sections B(a) and B(b) are unenforceable. "We review a district court's grant or denial of summary judgment, as well as the court's interpretation of contracts upon

which the summary judgment was based, for correctness." *Bloom Master Inc. v. Bloom Master LLC*, 2019 UT App 63, ¶ 11, 442 P.3d 1178 (cleaned up).[2]

ANALYSIS

¶12 As noted, the district court determined that Article I, Sections B(a) and B(b) of the postnuptial agreement are silent—and therefore indefinite—on the following terms, which it deemed to be essential: (1) a procedure for how to determine Mark's income for purposes of the agreement's guarantee of minimum alimony, (2) a schedule or due date for alimony payments, (3) a procedure and schedule for how and when the determination of Mark's income is to be updated, and (4) when an updated calculation of alimony becomes effective.

¶13 On appeal, Jackie contends that instead of holding that Article I, Sections B(a) and B(b) are unenforceable, "[u]nder Texas law, the district court could and should have implied any purportedly missing terms based on other provisions of the [postnuptial agreement] or Texas law and custom." We agree with Jackie and reverse the district court's holding that Article I, Sections B(a) and B(b) of the postnuptial agreement are unenforceable.

¶14 Under Texas law, "to be enforceable, a contract must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Fischer v. CTMI, LLC*, 479

---

2. Jackie also asserts that the district court erred when it determined that the postnuptial agreement's clause eliminating the parties' prenuptial waiver of alimony is inseverable and, thus, unenforceable as well. Because we conclude that the postnuptial agreement's minimum alimony provisions are enforceable, we need not address the severability of the clause eliminating the parties' prenuptial waiver of alimony.

S.W.3d 231, 237 (Tex. 2016) (cleaned up). Thus, "a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound." *Id.* But "forfeitures [based on indefinite or uncertain terms] are not favored in Texas, and contracts are construed to avoid them." *Id.* at 239 (cleaned up). In fact, "Texas courts will not construe a contract to result in a forfeiture unless it cannot be construed in any other way." *REO Indus., Inc. v. Natural Gas Pipeline Co. of Am.*, 932 F.2d 447, 454 (5th Cir. 1991); *see also Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 842 (Tex. 2010) (citing the foregoing statement from *REO Industries* with approval); *Fischer*, 479 S.W.3d at 239 (citing *Kirby Lake* for its reliance on the foregoing statement from *REO Industries*).

¶15    Accordingly, a court following Texas law "will find terms to be sufficiently definite whenever the language is reasonably susceptible to that interpretation." *Fischer*, 479 S.W.3d at 239. Such a court "may look to the relationship between the parties and the circumstances surrounding the contract to determine if the terms were sufficiently definite for the parties to understand their obligations." *Ahmed v. Ahmed*, 261 S.W.3d 190, 195 (Tex. App. 2008). And it may, if necessary, "supplement[] or give[] further precision" to a "material term that appears to be indefinite or uncertain." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 481 (Tex. 2019). Such supplementation may be accomplished by "imply[ing] terms that can reasonably be implied" and by giving terms "precision by usage of trade or by course of dealing." *Fischer*, 479 S.W.3d at 239 (cleaned up).

¶16    We conclude that Article I, Section B of the postnuptial agreement is sufficiently definite to confirm that both parties actually intended to be contractually bound thereby.[3] The plain

---

3. "A contract need only be definite and certain as to those terms that are material and essential to the parties' agreement." *Fischer*

(continued…)

terms of the agreement indicate that Mark and Jackie intended—in the event of a divorce—for a trial court in the jurisdiction where the divorce action is filed to begin by making an alimony determination based on the law of that jurisdiction. The parties' intent for there to be an alimony determination under applicable state law is evident from their elimination of the prenuptial alimony waiver and the fact that an alimony determination under applicable state law is a prerequisite to determining whether such an alimony award would satisfy the minimum amount of alimony guaranteed by the postnuptial agreement. That such a state law alimony determination is to be based on the law of the jurisdiction in which the divorce action is filed is implicit in Article I, Sections B(a) and B(b)'s language stating that "[i]n the event that the jurisdiction where the divorce is filed does not provide for spousal support or alimony, [the minimum alimony payment guaranteed to Jackie by the postnuptial agreement] shall be characterized as a division of marital property." These facts lead naturally to the conclusion that Article I, Section B of the postnuptial agreement is not indefinite as to a schedule or due date for alimony payments, a procedure and schedule for how and when the determination of Mark's income is to be updated, and when an updated calculation of alimony becomes effective.

¶17    Each state has law governing the timing and modification of alimony payments.[4] *See, e.g.*, Tex. Fam. Code § 8.052 (providing

---

*v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016) (cleaned up). Because we determine that the terms at issue here are sufficiently definite in any event, we assume, without deciding, that they are material and essential to the postnuptial agreement.

4. In their prenuptial agreement, the parties use the term "alimony" to refer to "any claim for the purposes of alimony, maintenance, and support." Again using the term "alimony" to refer interchangeably to alimony, maintenance, or support,

(continued…)

factors by which the court is to "determine the nature, amount, duration, and manner of periodic [spousal maintenance] payments"); *id.* § 8.057(c) (allowing for modification of a "maintenance" order based "on a proper showing of a material and substantial change in circumstances"); Va. Code § 20-107.1(E) (providing factors a court should consider "[i]n determining the nature, amount and duration" of a spousal "support and maintenance" award); *id.* § 20-109(B) (providing for modification of "spousal support" upon an unanticipated and "material change in the circumstances of the parties" or when "an event which the court anticipated would occur during the duration of the award and which was significant in the making of the award, does not in fact occur through no fault of the party seeking the modification"). This includes Utah. *See* Utah Code § 81-4-504(1) ("The court has continuing jurisdiction to make substantive changes and new orders regarding alimony based on a substantial material change in circumstances not expressly stated in the divorce decree or in the findings that the court entered at the time of the divorce decree."); *id.* § 81-7-102(1) ("All monthly payments of . . . alimony are due on the 1st day of each month . . . ."); *id.* § 81-7-102(5)(b) ("If the tribunal orders that the support order should be modified, the effective date of the modification shall be the month following service on the party whose support is affected."); *Beals v. Beals*, 682 P.2d 862, 863–64 (Utah 1984) (acknowledging a district court's discretion to award lump sum or periodic alimony, depending on the circumstances of the case); *Chesley v. Chesley*, 2017 UT App 127, ¶ 9, 402 P.3d 65 ("Trial courts have considerable discretion in determining alimony . . . ." (cleaned up)).

---

Article I, Section B of the postnuptial agreement then eliminates the parties' previous "alimony" waiver. Following the parties' lead, we likewise use the term "alimony" to refer to whatever type of spousal support payment is provided for by the law of a particular jurisdiction.

¶18 Because the postnuptial agreement plainly contemplates that except perhaps as to the amount and duration of the award—which terms may be conformed to meet the minimums guaranteed by the postnuptial agreement—alimony will be awarded in accordance with the law of the state where the action is filed, the postnuptial agreement is sufficiently definite as to the timing and modification of alimony payments: those matters are to be governed by applicable state law. And under Utah law, which is applicable here, the frequency of payments is determined at the discretion of the district court. *See Beals*, 682 P.2d at 863–64; *Chesley*, 2017 UT App 127, ¶ 9. If the court orders monthly payments, then the due date is the first of each month. *See* Utah Code § 81-7-102(1). Modification of the award may be sought upon a substantial and material change in the parties' relevant circumstances, including a substantial and material change in Mark's income. *See id.* § 81-4-504(1). And the effective date of any modification is "the month following service on the party whose support is affected." *Id.* § 81-7-102(5)(b).

¶19 For the foregoing reasons, we reverse the district court's determination that the postnuptial agreement is indefinite as to a schedule or due date for alimony payments, a procedure and schedule for how and when alimony—and Mark's income specifically—is to be updated, and when an updated calculation of alimony becomes effective. This leaves only the issue of how "income" is to be calculated for purposes of determining whether the alimony amount identified under state law meets the minimum amount guaranteed by the postnuptial agreement.

¶20 Unlike the terms already addressed, the term "income" in Article I, Sections B(a) and B(b) of the postnuptial agreement cannot be readily rendered sufficiently definite by reference to the law of the jurisdiction in which the divorce action is filed. This is true for at least two reasons. First, state laws generally do not include a definition of "income" for purposes of determining a minimum alimony amount. This is so because state laws generally

do not provide for a minimum amount of alimony; instead, after any prerequisites are met, alimony calculations are usually left to the discretion of the trial court based on consideration of a set of mandated factors. *See, e.g.*, Utah Code § 81-4-502; Tex. Fam. Code § 8.052; Va. Code § 20-107.1(E). Second, those mandated factors usually include the parties' respective needs and ability to meet those needs, factors that are frequently determined by first identifying their gross incomes and, from there, their net incomes. *See, e.g.*, *Merrill v. Merrill*, 2024 UT App 125, ¶¶ 64–67, 556 P.3d 1070; *Chaney v. Karabaic-Chaney*, 837 S.E.2d 76, 77–80 (Va. Ct. App. 2020); *Howe v. Howe*, 551 S.W.3d 236, 256–57 (Tex. App. 2018). Because state laws generally do not include a single definition of "income" that is applicable to all alimony determinations, or a definition of "income" specifically for purposes of determining a minimum alimony amount, we must look somewhere other than the law of the jurisdiction in which the divorce action is filed for a definite meaning of "income" as used in Article I, Section B of the postnuptial agreement.

¶21 The postnuptial agreement directs that it is to be "governed by, construed and enforced in accordance with the laws of the State of Texas." So we now look to Texas law. And in this context, Texas law is somewhat unusual. The Texas Family Code states, "A court may not order maintenance that requires an obligor to pay monthly more than the lesser of: (1) $5,000; or (2) 20 percent of the spouse's average monthly gross income." Tex. Fam. Code § 8.055(a). And the Texas Family Code then specifies what is—and is not—included in "gross income." *See id.* § 8.055(a-1). Thus, Texas law identifies "gross income" as the measure of income to be used when determining whether an otherwise applicable alimony amount is within or exceeds a defined threshold, and it provides specific instructions on how to determine a party's "gross income" for that purpose.

¶22 As noted at the outset, Texas law requires that contracts be construed to avoid forfeitures based on indefinite or uncertain

terms where possible, *see Fischer v. CTMI, LLC*, 479 S.W.3d 231, 239 (Tex. 2016), and it therefore allows courts to "supplement[] or give[] further precision" to a material term that might otherwise "appear[] to be indefinite or uncertain," *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 481 (Tex. 2019), including by looking to "usage of trade," *Fischer*, 479 S.W.3d at 239 (cleaned up). And again, the postnuptial agreement directs that its terms be "construed and enforced in accordance with the laws of the State of Texas." Because Texas law identifies a specific definition of gross income as the measure to be used when determining whether an otherwise applicable alimony amount is within or exceeds a particular threshold, we conclude that the term "income" in Article I, Sections B(a) and B(b) of the postnuptial agreement must be supplemented to mean "gross income" as defined in section 8.055(a-1) of the Texas Family Code.

¶23 Resisting this conclusion, Mark cites two Texas cases, *Deen v. Deen*, 631 S.W.2d 215 (Tex. App. 1982), and *Dicker v. Dicker*, 434 S.W.2d 707 (Tex. App. 1968). In *Deen*, divorcing spouses entered a settlement agreement that required the husband to pay the wife "[t]he sum of the greater of $1,000.00 per month or forty percent (40%) of the [husband's] earned income . . . as defined by the Internal Revenue Code, per month from the date of divorce until they shall cease upon the occurrence of one of the contingencies specified [in the agreement]." 631 S.W.2d at 216. Mark characterizes this as "an instructive example of how a percentage-based spousal support contract should be worded to provide the essential terms that are missing from the [postnuptial agreement] in this case."

¶24 In *Dicker*, divorcing spouses entered a settlement agreement that said,

> The Husband shall, without regard to remarriage of the Wife in the event of a divorce between the parties, pay to the Wife the sum of One Hundred

Thousand ($100,000.00) Dollars, net after taxes, if any. The Husband shall pay said sum of One Hundred Thousand ($100,000.00) Dollars by making annual payments in an amount equal to one third of the net cash flow received by him each year from all his assets and investments. For purposes of this provision the term "net cash flow" shall be understood to mean the difference between gross receipts and actual cash disbursements incurred in the business of earning such receipts. Such cash disbursements shall be only those as are expressly deductible for Federal income tax purposes, but no deduction shall be allowed for depreciation.

434 S.W.2d at 710–11. Mark similarly describes this agreement as a "helpful example[] of the types of essential terms that are absent from the [postnuptial agreement] in this case."

¶25 However, the issue in *Deen* was whether the phrase "earned income of [the husband] as defined by the Internal Revenue Code" was ambiguous, and the court held that it was not. *See* 631 S.W.2d at 217. The definiteness of the contract was not in question. *See id.* at 216–17. Likewise, *Dicker* did not involve the definiteness of the relevant contractual provision but, rather, the proper interpretation of that provision. *See* 434 S.W.2d at 712–13. Neither case held that the terms at issue—or similarly specific ones—were required to render the agreements sufficiently definite to be enforceable. *See Deen*, 631 S.W.2d at 216–17; *Dicker*, 434 S.W.2d at 712–13. Accordingly, these cases do not sway our analysis.

¶26 In sum, for the reasons given, we conclude that, along with the other challenged terms of the postnuptial agreement, the term

"income" is sufficiently definite to render Article I, Sections B(a) and B(b) of the contract enforceable.[5]

## CONCLUSION

¶27 The district court erred by holding that Article I, Sections B(a) and B(b) of the postnuptial agreement are unenforceable due to insufficiently definite terms. We therefore reverse the district court's decision on that issue and remand this matter for further proceedings consistent with this opinion.[6]

———————

5. In addition to overruling the district court's enforceability determination, our holding here also necessarily overrules its prior determination that the term "income" is ambiguous. *See Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.*, 750 S.W.2d 820, 822 (Tex. App. 1988) ("[W]hen the contract is so worded that a court may properly give it a certain or definite legal meaning, it is not ambiguous.").

6. Mark identifies several additional arguments about the formation and validity of the postnuptial agreement that he raised below but on which the district court did not render a decision. Because "we are mindful that we are a court of review, not of first view," *Richmond v. Bateman*, 2024 UT App 103, ¶ 31, 554 P.3d 341 (cleaned up), we do not address those arguments. Nor do we address the meaning of "intimate contact" under Article I, Section B(b) of the postnuptial agreement. Those arguments and issues may be again raised and resolved on remand.